UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11570

SOUTH SHORE IMPORTED CARS, INC.
D/B/A SOUTH SHORE VOLKSWAGEN

v.

VOLKSWAGEN OF AMERICA, INC.,
AN OPERATING UNIT OF
VOLKSWAGEN GROUP OF AMERICA

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

March 22, 2010

STEARNS, D.J.

Plaintiff South Shore Imported Cars, Inc., d/b/a South Shore Volkswagen ("South Shore") is a party to a Dealer Agreement with defendant Volkswagen of America, Inc. ("VWoA"). The Agreement authorizes South Shore to operate a Volkswagen dealership in Hanover, Massachusetts. On July 7, 2009, VWoA served South Shore with a notice of its intent to terminate the Agreement. In its Amended Complaint, South Shore alleges that VWoA: (1) acted without good cause and in an arbitrary or unconscionable manner in violation of Mass. Gen. Laws ch. 93B, § 5(a); (2) violated Mass. Gen. Laws ch. 93B, § 4(c)(8), by failing to promptly mail a dealership application to a successor-transferee nominated by South Shore; and (3) violated the common law implied covenant of good faith and fair dealing. The parties have filed cross-motions for summary judgment. The court heard oral argument on the motions on March 12, 2010.

BACKGROUND

South Shore opened as an Authorized Volkswagen Retailer in Hanover in October of 1990.  On April 28, 2000, South Shore and VWoA entered into the Dealer Agreement that is in dispute.  The Agreement requires South Shore, among other things, to maintain an open and unrestricted wholesale line of credit, or "floor plan," to finance the purchase of a revolving inventory of new Volkswagen vehicles.[1]  Dealers are not permitted to purchase vehicles from Volkswagen except through an approved floor plan.

Prior to December of 2008, South Shore maintained an unrestricted floor plan with Sovereign Bank ("Sovereign"), through which it purchased vehicles from Volkswagen and other manufacturers.[2]  That month, however, South Shore began to experience "extreme financial difficulties."  South Shore fell nearly one million dollars "out of trust" with Ford Motor Credit and approximately $600,000 behind in its payments to Sovereign.  In early December of 2008, Sovereign placed a hold on South Shore's floor plan.  Sovereign notified VWoA of the hold in a letter mailed to VWoA on December 2, 2008.

---

[1]Paragraph 2 of the Dealer Agreement incorporates certain documents, including the Volkswagen Dealer Agreement Standard Provisions and the Volkswagen Dealer Operating Standards.  Volkswagen Operating Standard 3 requires that:

> [a]n open and unrestricted wholesale line of credit dedicated solely  toward the purchase of new Volkswagen vehicles shall be maintained with a reputable financial institution reasonably acceptable to VWoA.   The minimum amount of this wholesale line of credit shall be in an amount determined by VWoA.   VWoA shall determine this amount by dividing Dealer's Annual Planning Volume by six, resulting in Dealer's average 60-day supply, and multiplying that number of units by the average invoice of a new Volkswagen vehicle.

[2]The Sovereign floor plan financed the purchase of vehicles from Volkswagen, Chrysler, Jeep, and Dodge.  A second floor plan established by South Shore with Ford Motor Credit financed the purchase of Volvo vehicles.

On December 8, 2008, VWoA sent South Shore a letter declaring a breach of the Dealer Agreement and demanding that South Shore submit a plan to restore its unrestricted line of credit.[3]   VWoA also wrote to Rose Bokavich, South Shore's Chief Operating Officer, reminding her of the floor plan requirement and asking about the status of South Shore's relationship with Sovereign.   Bokavich assured VWoA that the hold would be "lifted momentarily" and that she was negotiating with several other lenders to obtain additional financing.   Neither eventuality bore fruit.   Despite the default and a shrinking inventory of new vehicles,[4] VWoA permitted South Shore to continue operating interim as an Authorized Volkswagen Dealer.[5]

In the meantime, South Shore began searching for a buyer-successor to the dealership.   On March 10, 2009, South Shore executed an Assist to Sell Letter authorizing VWoA to help with the sale of its dealership assets.   In June of 2009, Michael McKean, South Shore's business broker, informed VWoA that he was negotiating the sale of South Shore's assets to Gerald and Timothy Good ("Good Brothers"), subject to VWoA's

---

[3]South Shore argues that VWoA's response deviated from the procedure it usually followed when one of its dealers lost its floor plan financing.   According to South Shore, VWoA typically sends a letter giving the dealer thirty days to cure the default.   If the dealer fails to do so, VWoA sends a second letter notifying the dealer that its Dealer Agreement will be terminated if the line of credit is not restored within the next fifteen days.   Only if a dealer misses this second deadline is a Termination Notice sent.

[4]Without the floor plan in place, South Shore's sales of new Volkswagen vehicles declined from the 200-300 range in 2007 and 2008, to just 40 in 2009.

[5]The forbearance permitted South Shore to, among other things, continue to service and repair customer vehicles remaining under warranty.

approval.[6]

On June 17, 2009, Thomas Murphy, VWoA's Franchisor Representative, hand-delivered a letter to South Shore notifying it that it had fifteen days to cure the default. Murphy met the same day with Rose Bokavich and Richard Bokavich, South Shore's President.  They discussed the possible sale of the dealership to the Good Brothers, Frederick Shaw, or Daniel Quirk, as well as a "last ditch" effort to obtain new floor plan financing through GMAC.[7]  The fifteen-day grace period expired without the obtaining of new financing or a firm offer from a willing buyer.

On July 7, 2009, VWoA, pursuant to Mass. Gen. Laws ch. 93B, § 5(h), served a sixty-day Notice of Termination on South Shore, citing its failure to maintain an open and unrestricted floor plan.  The termination was to take effect on September 8, 2009.

On July 27, 2009, South Shore signed a letter of intent to sell the dealership to the Good Brothers.  Rose Bokavich telephoned Michael Rueckert, VWoA's Regional Network Manager, informing him of the status of the negotiations.  Rueckert told Bokavich that VWoA would need to review an executed Asset Purchase Agreement.  On August 28, 2009, the Good Brothers and South Shore executed a Purchase and Sale Agreement and Asset Purchase Agreement covering the dealership's real estate and other assets.

---

[6]Between January of 2009 and July of 2009, South Shore approached several other potential buyers without success.

[7]Gerald and Timothy Good have over nineteen years of experience as automobile dealers, having owned and operated a Ford dealership in Randolph, Massachusetts, and a Dodge dealership in Weymouth.  Frederick Shaw owns a Saab dealership in Hingham, Massachusetts.  Daniel Quirk is the owner of the largest Volkswagen dealership in New England.

Rose Bokavich contacted Rueckert the following business day, informing him of the Agreements and requesting that he forward a dealership application to the Good Brothers. Bokavich emailed the Agreements to Rueckert on August 31, 2009.  On September 4, 2009, despite earlier positive indications, VWoA decided against sending a dealership application to the Good Brothers.  Numerous telephone calls and emails from Bokavich and McKean to Rueckert between August 31, 2009, and September 8, 2009, went unanswered.

South Shore filed the original Complaint in Plymouth County Superior Court on September 8, 2009, seeking, among other relief, to enjoin the termination of the Dealer Agreement. See Mass. Gen. Laws ch. 93B, § 5(f).  VWoA removed the case to the federal court on September 21, 2009, on diversity grounds.  South Shore filed the Amended Complaint in the district court on November 6, 2009.  On December 9, 2009, the parties entered into a standstill agreement pending this court's ruling on the cross-motions for summary judgment.

## DISCUSSION

A district court grants summary judgment "if the pleadings, discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue as to a material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The nonmovant in turn bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." Mulvihill v. Top-Flite Golf

Co., 335 F.3d 15, 19 (1st Cir. 2003).  "The mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Consequently, "a party opposing summary judgment must present definite, competent evidence to rebut the motion."  Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000) (internal quotations and citations omitted).  On cross-motions for summary judgment, "the court must consider each motion separately, drawing inferences against each movant in turn."  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

In 1970, the Massachusetts Legislature enacted a set of rules regulating business practices between vehicle manufacturers and dealers, codified as Mass. Gen. Laws ch. 93B.  The "Dealer's Bill of Rights," as it is colloquially known, defines a motor vehicle "dealer" as "any person who, in the ordinary course of its business, is engaged in the business of selling new motor vehicles to consumers or other end users pursuant to a franchise agreement," while a manufacturer is defined as "any person engaged in the business of manufacturing or assembling new and unused motor vehicles."  Mass. Gen. Laws ch. 93B, § 1.  A "franchise" is "an oral or written arrangement for a definite or indefinite period in which a manufacturer or distributor grants to a motor vehicle dealer a license to use a trade name, service mark, or related characteristic, and in which there is a community of interest in the marketing of new motor vehicles or services related thereto at wholesale, retail, leasing, or otherwise."  Id.  There is no dispute that South Shore is a dealer, that VWoA is a vehicle manufacturer, and that their relationship is one of franchisor-franchisee.  Consequently, the court will turn first to Chapter 93B for guidance.

Termination of the Dealer Agreement

Under Massachusetts law,

[i]t shall be a violation of subsection (a) of section 3 for a manufacturer, distributor or franchisor representative without good cause, in bad faith or in an arbitrary or unconscionable manner: (1) to terminate the franchise agreement of a motor vehicle dealer; (2) to fail or refuse to extend or renew the franchise agreement of a motor vehicle dealer upon its expiration; (3) to offer a renewal, replacement or succeeding franchise agreement containing terms and conditions the effect of which is to substantially change the sales and service obligations, capital requirements or facilities requirements of a motor vehicle dealer; or (4) to amend, add or delete any other material term or condition set forth in a motor vehicle dealer's franchise agreement.

Mass. Gen. Laws ch. 93B, § 5(a).

"Good cause" for termination of a franchise agreement is found to exist:

if the motor vehicle dealer failed to comply with or observe a provision of the franchise agreement that is material to the franchise relationship, including without limitation, reasonable sales and service performance criteria and capital, personnel, and facility requirements, which were communicated in writing to the motor vehicle dealer within a reasonable period before the effective date of the termination or nonrenewal, such that a reasonable opportunity to cure was afforded.

Mass. Gen. Laws ch. 93B, § 5(h).

The parties do not dispute that the Dealer Agreement incorporates Operating Standard 3, which requires South Shore to maintain "[a]n open and unrestricted wholesale line of credit dedicated solely toward the purchase of new Volkswagen vehicles." Also undisputed is that South Shore's failure to maintain an open and unrestricted floor plan constituted a breach of the Dealer Agreement. The only dispute is whether that breach was material.

A term is material to an agreement when it involves "an essential and inducing

7

feature." <u>Buchholz v. Green Bros. Co.</u>, 272 Mass. 49, 52 (1930).  Whether a term in a Dealer Agreement requiring a dealer to maintain a floor plan to finance the purchase of its inventory of vehicles is material has not been addressed by the Massachusetts appellate courts.  Nonetheless, the issue is not one of first instance.  In 2002, the Maryland District Court granted summary judgment for a defendant manufacturer after a dealer lost its floor plan financing where the Dealer Agreement provided "that [the manufacturer] may terminate the agreement upon the '[l]oss of an adequate wholesale credit line without implementing a satisfactory substitute within thirty (30) days.'" <u>Hale Trucks of Maryland, LLC v. Volvo Trucks N. Am., Inc.</u>, 224 F. Supp. 2d 1010, 1020 (D. Md. 2002).  Three years later, the Connecticut District Court held that a manufacturer had "good cause" under the Connecticut Franchise Act to terminate a franchise after the dealer had failed to maintain floor plan financing.  <u>See</u> <u>Chic Miller's Chevrolet, Inc. v. Gen. Motors Corp.</u>, 352 F. Supp. 2d 251 (D. Conn. 2005).  In granting summary judgment, the court specifically noted that the floor plan provision was a material term of the Dealer Agreement.  <u>Id</u>. at 259.  There is simply no principled basis for finding otherwise.  Without access to floor plan financing, South Shore was unable to maintain an inventory of new Volkswagen vehicles, causing its sales to collapse.  The essence of the franchise agreement was to sell cars; it is inconceivable that Volkswagen would have entered into a Dealer Agreement with a franchisee that was incapable of executing the Agreement's raison d'être.[8]

VWoA complied fully with the notice provision of Mass. Gen. Laws ch. 93B, § 5(h),

---

[8]One is tempted to say that there is no Massachusetts case law on point for the simple reason that it has never previously occurred to anyone that the floor plan financing term might not be material.

when on December 8, 2008, six days after Sovereign notified it of the hold on the floor plan, it gave written notice to South Shore that it was in breach of the Dealer's Agreement and was required to submit a plan explaining how the damage would be undone.  Finally, VWoA gave South Shore ample time to effect a cure – either by repairing its relationship with Sovereign, by obtaining a new lender, or by finding a successor acceptable to VWoA. The final Termination Notice was not issued until July 7, 2009, some seven months after the default.

South Shore argues that despite VWoA's discharge of its obligations under Mass. Gen. Laws ch. 93B, § 5(h), VWoA waived its right to enforce the floor plan provision by permitting South Shore to continue in business for seven months and by accepting the March 2009 Assist to Sell Letter.  Under Massachusetts law, as in other jurisdictions, a waiver is an "intentional relinquishment of a known right."  Doujotos v. Leventhal, 271 Mass. 280, 282 (1930), quoting Kent v. Warner, 12 Allen 561, 563 (1866).  To establish a waiver, South Shore must meet the "uncompromising" standard set by Massachusetts law: proof of "'clear, decisive, and *unequivocal* conduct on the part of an authorized representative . . . indicating that [it] would not insist on adherence to the [agreement].'" Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 992 (1st Cir. 1988), quoting Glynn v. City of Gloucester, 9 Mass. App. Ct. 454, 462 (1980) (emphasis in original).  See also Dunkin' Donuts, Inc. v. Panagakos, 5 F. Supp. 2d 57, 60 (D. Mass. 1998).

While rights may be waived "merely by failing to assert them," Spence v. Reeder, 382 Mass. 398, 411 (1981), VWoA's actions on the heels of South Shore's breach of the

Dealer Agreement evince exactly the opposite intent.  VWoA wrote immediately to South Shore (on December 8, 2008) demanding that it cure the default and asking to see South Shore's plan to achieve that end.   South Shore argues that VWoA's acceptance of the Assist to Sell Letter reflects a reversal of direction on VWoA's part, but it does not – it simply demonstrates that VWoA was looking for the cure, as was its right.  While Mass. Gen. Laws ch. 93B, § 5(h), required that VWoA afford South Shore "a reasonable opportunity" to cure, the seven months of grace that VWoA extended to South Shore more than meets the statutory requirement, particularly given South Shore's lack of concrete progress on any front during the hiatus.[9]

Finally, South Shore alleges that VWoA terminated the Dealer Agreement in bad faith because it acted with the knowledge that South Shore was in active negotiations with the Good Brothers, and that it did so motivated by a secret preference for some other (undisclosed) buyer.  In determining "bad faith" under Chapter 93B, a court may consider conduct broader and less extreme than mere coercion or intimidation.  See Gen. GMC, Inc. v. Volvo White Truck Corp., 918 F.2d 306, 309 (1st Cir. 1990).  A manufacturer does not act in bad faith by exercising sound business judgment.  See Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc., 976 F.2d 58, 63-64 (1st Cir. 1992).  Nor is it bad faith for a manufacturer to choose to exercise its valid contractual rights.  See Wagner & Wagner Auto Sales, Inc. v. Land Rover N. Am., 547 F.3d 38, 44 (1st Cir. 2008).  South Shore's allegation that VWoA chose not to send a dealership application to the Good

---

[9]South Shore's argument that VWoA's forbearance amounted to a relinquishment of its rights falls under the hoary adage that "no good deed may go unpunished."

Brothers because it disapproved of South Shore's nominated successor entails no more than an accusation that VWoA acted unreasonably in doing what the law and the Dealer Agreement permitted it to do.  Because South Shore has failed to show that VWoA did not comply with any of the three elements required by Mass. Gen. Laws ch. 93B, § 5(h), to justify a good cause termination, while VWoA has shown the contrary, VWoA's termination of the Dealer Agreement was proper as a matter of law.

Violation of ch. 93B, § 4 (c)(8)

Mass. Gen. Laws ch. 93B, § 3(a), provides that it is unlawful for any manufacturer, distributor, franchisor representative, or motor vehicle dealer to engage in unfair or deceptive acts or practices, as defined in Section 4.  Chapter 93B provides, in relevant part that:

> [i]t shall be deemed a violation of subsection (a) of section 3 for a manufacturer, distributor or franchisor representative:
>
> * * * *
>
> (c)(8) to impose upon any motor vehicle dealer. . . unreasonable restrictions upon . . . the ability of any individual, proprietor or stockholder to use, sell or transfer any interest in the dealership. . . .  There shall be no assignment, delegation or transfer of the franchise or management or control thereunder without the written consent of the manufacturer or distributor, which consent shall not unreasonably be withheld.  The manufacturer or distributor shall promptly mail a dealership application to a proposed assignee, delegee or transferee following any request therefor submitted by the proposed assigning, delegating or transferring motor vehicle dealer . . . the manufacturer or distributor shall, within 60 days of the receipt of the application and all supporting documentation as specified therein, review the application and approve or reject it.

Mass. Gen. Laws ch. 93B, § 4(c)(8).

The Dealer Agreement between South Shore and VWoA similarly provides that:

> [i]f Dealer chooses to transfer its principal assets or change owners, VWoA has the right to approve the proposed transferees, the new owners and executives, and, if different from the Dealer's, their premises. VWoA will consider in good faith any such proposal Dealer may submit during the term of this Agreement.

Aff. of Rose Bokavich, Ex. A, Art. 12(1).   While it is clear from the plain language of both the statute and the Dealer Agreement that VWoA was obligated to consider in good faith any proposed assignee, delegee, or transferee presented by South Shore *so long as the franchise agreement was in full force and effect*, the condition precedent no longer attached after the delivery of the Termination Notice.  At that point, South Shore no longer owned the franchise free and clear, but rather owned the remnants of a franchise subject to a sixty-day dissolution.

"'It is a general principle of contract law that an assignment operates to transfer to the assignee *only* those rights and interests possessed by the assignor.'"  Chic Miller's Chevrolet, 352 F. Supp. 2d at 258, quoting Glenn v. Exxon Co., U.S.A., 801 F. Supp. 1290, 1297 (D. Del. 1992) (emphasis in original) (holding that where a plaintiff attempted to transfer a gas station franchise after notice of termination but before the effective date was entitled to transfer only the handful of days remaining on the franchise term).   When on August 31, 2009, South Shore made the request to VWoA to mail a dealership application to the Good Brothers only eight days of the franchise remained.  VWoA's decision not to provide the Good Brothers with a dealership application under the circumstances was reasonable and lawful.  See H-D Michigan, LLC v. Sovie's Cycle Shop, Inc., 626 F. Supp. 2d 274, 279 (N.D.N.Y. 2009) (under New York's Franchise Motor Vehicle Act, it was not unreasonable for a franchisor to refuse a transfer request where the request was made

after the franchise was subject to termination).    On August 31, 2009, South Shore was attempting to assign to the Good Brothers something that it no longer owned.[10]   See Glenn, 801 F. Supp. at 1297 ("[W]hen the Plaintiffs attempted to assign their franchise . . . in September 1988, [they] possessed a franchise that was to terminate effective October 25, 1988 . . . . The Plaintiffs could assign only the period remaining.").   Consequently, VWoA did not as a matter of law violate Mass. Gen. Laws ch. 93B. § 4(c)(8), or breach the Dealer Agreement by failing to provide the Good Brothers with a dealership application.

Covenant of Good Faith and Fair Dealing

"Every contract implies good faith and fair dealing between the parties to it." Warner Ins. Co. v. Comm'r of Ins., 406 Mass. 354, 362 n.9 (1990), quoting Kerrigan v. Boston, 361 Mass. 24, 33 (1972).   "The scope of the covenant is only as broad as the contract that governs the particular relationship." Liss v. Studeny, 450 Mass. 473, 477 (2008), quoting Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385 (2005).   "The covenant may not, however, be invoked to create rights and duties not otherwise provided for in an existing contractual relationship, as the purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in

---

[10]South Shore relies on the following sentence in Mass. Gen. Laws ch. 93, § 5(g): "[p]ending a decision by the court on any motion for an injunction, the manufacturer or distributor and motor vehicle dealer shall in good faith perform all obligations incumbent upon them under the franchise agreement and applicable law," in support of its contention that VWoA remained duty-bound to send the dealership application to the Good Brothers. This is not a correct reading of the statute.  The invocation of the court's intervention requires that the parties respect the court's ultimate determination by doing nothing in the interim that will irrevocably alter a right that the court may vindicate.  It does not require that either party surrender that same right (in this case the right of VWoA to terminate the franchise without regard to a successor nominated unilaterally by South Shore) before the court makes its ruling.

their performance." <u>Uno Rests., Inc. v. Boston Kenmore Realty Corp.</u>, 441 Mass. 376, 385 (2004).  Article 12(1) of the Dealer Agreement required that VWoA consider in good faith a proposed transfer of the franchise only so long as South Shore remained in good standing as a dealer in full possession of the franchise.  Because South Shore was not in good standing at the time that it proposed the sale, and moreover, because it was seeking to sell an interest in the franchise that it no longer owned, the covenant of good faith and fair dealing cannot inject a term or condition into the parties' relationship that neither the statute nor the Dealer Agreement ever contemplated.

ORDER

For the foregoing reasons, VWoA's motion for summary judgment is <u>ALLOWED</u>. South Shore's cross-motion for summary judgment is <u>DENIED</u>.  The clerk will enter judgment for VWoA and close the case.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE